**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA ex rel. Carlee Bright, Jessica Bell, Melody DeAngelis, Dr. Joseph O'Quinn, Mandy Dalton and CARLEE BRIGHT, JESSICA BELL, MELODY DEANGELIS, MANDY DALTON and DR. JOSEPH O'QUINN, individually,<br><br>      Plaintiffs,<br>v.<br><br>UNITED PHYSICIAN GROUP, LLC, LIFEBRITE LABORATORIES, LLC, LIFEBRITE HOSPITAL GROUP, LLC, LISA FORGIONE and CHRISTIAN FLETCHER,<br><br>      Defendants. | C/A: 6:20-_____<br><br><br><br><br><br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>(JURY TRIAL DEMANDED) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff and *qui tam* Relators, by and through her undersigned counsel, alleges of personal knowledge as to their own observations and actions, and on information and belief as to all else, as follows:

**I.     PRELIMINARY STATEMENT**

1. United Physician Group, LLC [UPG] is owned and operated by Christian Fletcher [Fletcher]. Through a myriad of different companies, pretextual third parties, and written agreements, Christian Fletcher developed a new way of defrauding the government. Fletcher essentially created a captive group of South Carolina physicians who are required to refer all urine drug tests [UDTs] to his own laboratory, Lifebrite Laboratories, LLC [LifeBrite]. The physicians are not allowed to alter or otherwise interfere with the

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

UDTs for their patients. Fletcher does not allow any point of care [POC] testing at the UPG facilities, but rather requires all UDTs, both presumptive and determinative, to be controlled by LifeBrite. Fletcher's iron grip on The Department of Health and Human Services referral process is so complete that the individual doctors treating patients at UPG play no role in the determination of whether a presumptive test indicates a need for a definitive test. In fact, Fletcher's claims under oath that the Physician's S.O.S. Group, Inc. actually regulates the compliance and testing practices of UPG's providers, including meeting with providers to go over testing rationale, frequency of tests, drug prescription processes, etc. is patently false.

## II.     JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

3. The Court has personal jurisdiction over Defendants because Defendants carried out their fraudulent scheme in this District.

4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b)(2), because Defendants can be found in, are licensed to do business in, and transact or have transacted business in this District, and events and omissions that give rise to these claims have occurred in this District.

5. The Complaint has been filed within the time period prescribed by 31 U.S.C. § 3731(b) and 29 U.S.C. § 255.

## III.     NO PUBLIC DISCLOSURE; DIRECT AND INDEPENDENT KNOWLEDGE OF VIOLATIONS OF THE FALSE CLAIMS ACT

6. There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), of the "allegations or transactions" in this Complaint.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

7. Relators make the allegations in this Complaint based on their own knowledge, experience and observations.

8. Relators are the original source of the information on which the allegations herein are based, have direct and independent knowledge of such information, and have voluntarily disclosed such information to the United States before filing this action.

### IV. THE PARTIES

*A. Plaintiff the United States*

9. Plaintiff, the United States of America, brings this action by and through Relators. At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS"), reimbursed Defendants and pharmacies for medical services and prescription medications.

*B. Plaintiff Carlee Bright, P.A.C.*

10. Plaintiff Carlee Bright [Relator Bright] is a citizen of the United States and, at all relevant times, has been a resident of South Carolina.

11. Between September 5, 2019 and January 27, 2020, Relator Bright was employed by UPG at its facility located at 1650 Skylyn Drive, Spartanburg, South Carolina 29307.

12. Relator Bright was employed by UPG as a Physician's Assistant.

*C. Plaintiff Melody DeAngelis, F.N.P.C.*

13. Plaintiff Melody DeAngelis [Relator DeAngelis] is a citizen of the United States and, at all relevant times, has been a resident of South Carolina.

14. Between September 2019 and February 28, 2020, Relator DeAngelis was employed by UPG at its facility located at 116 Commons Blvd, Piedmont, South Carolina 29673.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

15.    Relator DeAngelis was employed by UPG as a Nurse Practitioner.

*D. Plaintiff Jessica Bell, APRN*

16.    Plaintiff Jessica Bell [Relator Bell] is a citizen of the United States and, at all relevant times, has been a resident of South Carolina.

17.    Between October 2019 and February 2, 2020, Relator Bell was employed by UPG at its facility located at 116 Commons Blvd, Piedmont, South Carolina 29673.

18.    Relator Bell was employed by UPG as a Nurse Practitioner.

*E. Plaintiff Mandy Dalton*

19.    Plaintiff Mandy Dalton [Relator Dalton] is a citizen of the United States and, at all relevant times, has been a resident of South Carolina.

20.    Between September 2019 and March 20, 2020, Relator Dalton was employed by UPG at its billing facility located inside 115 Brushy Creek Rd, Easley, South Carolina 29640.

21.    Relator Dalton was employed by UPG as a Billing Manager.

*Plaintiff Joseph O'Quinn, M.D.*

22.    Plaintiff Joseph O'Quinn, M.D. [Relator O'Quinn] is a citizen of the United States and, at all relevant times, has been a resident of South Carolina.

23.    Between September 2019 and March 2020, Relator O'Quinn was employed by UPG at its facility located at 116 Commons Blvd, Piedmont, South Carolina 29673.

24.    Relator O'Quinn was employed by UPG as a Physician.

*Defendants*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

25. Defendant United Physician's Group, LLC, [UPG] is a South Carolina limited liability company with a principal business address of 403 Hillcrest Drive, Easley, South Carolina 29640.

26. Defendant LifeBrite Hospital Group, LLC [LHG] is a Georgia limited liability company with its principal office located at 3970 Five Forks Trickum Road, SW, Suite A, Lilburn, Georgia 30047.  UPG is a subsidiary of LHG.

27. Defendant LifeBrite Laboratories, LLC [LifeBrite] is a Georgia limited liability company with its principal office located at 9 Corporate Blvd., NE, Suite A, Atlanta, Georgia 31410.  LLH is a wholly owned subsidiary of LifeBrite.

28. Defendant Lisa Forgione, M.D. is a physician working for UPG in South Carolina.  Upon information and belief, she is a citizen and resident of South Carolina.

29. Defendant Christian Fletcher is the non-physician owner, Chief Executive Officer [CEO] and policymaker for UPG, LLH, and LifeBrite.  Upon information and belief, Fletcher is a resident of Atlanta, Georgia.

## V.    THE STATUTORY FRAMEWORK

*A. The False Claims Act*

30. The False Claims Act, 31 U.S.C. §§ 3729 et seq., (the "FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability for an individual or entity that:

    a. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

   b. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…. 31 U.S.C. § 3729(a)(1).

31. "Knowing" is defined by the FCA to include "deliberate ignorance of the truth" or "reckless disregard of the truth." *Id.* at § 3729(b)(1).

32. The FCA defines "claim" to include any request for money that:

    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

     (I) provides or has provided any portion of the money or property requested or demanded; or

     (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded…. *Id.* at § 3729(b)(2)(A)(ii).

    Thus, the United States has a cause of action under the FCA for fraud upon the Medicaid program.

33. For each false claim or other FCA violation, the FCA provides for the assessment of treble damages, plus a civil penalty.

34. The FCA provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

B. *The Medicare Program*

35. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for certain healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395, *et seq.*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

36. The Department of Health and Human Services (DHS), through Centers for Medicaid and Medicare & Medicaid Services (CMS), administers the Medicare program.

37. Part B of the Medicare program authorizes payment of federal funds for medical and other health services for outpatients, such as those provided by Defendants. *See generally* Medicare Benefit Policy Manual (2012) at Chapter 15.

38. Medicare Part B is funded in part by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals who are age 65 or older, disabled, or suffering from end-stage renal disease may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. 42 U.S.C. §§ 1395j, 1395o, 1395r.

39. Individual enrolled under Medicare Part B may also receive prescription drug coverage under Medicare Part D. Part D prescription plans are administered by insurance companies receiving contributions from the federal treasury. 42 U.S.C. § 1395w-101, *et seq*.

40. CMS enters into agreements with healthcare providers such as Defendants to establish their eligibility to participate in the Medicare program. Individuals or entities who are participating providers in Medicare, such as Defendants, may seek reimbursement from CMS for services rendered to patients who are program beneficiaries.

41. During the times relevant herein, to become an authorized participant in Part B of the program, a provider must certify as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions …, and on the supplier's compliance with all applicable conditions of participation in Medicare.

> Medicare Enrollment Application, CMS Form-855B (07/11), at 31.

42. In order to receive reimbursement from Medicare, providers such as Defendants must submit a claim Form CMS-1500. That claim form requires the provider to make the following certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; … 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment ... 5) the services on this form were medically necessary ….

*Id.*, at 2.

43. The submission of such a certification, if false, is a violation of the FCA. 31 U.S.C. § 3729(a).

44. A provider may also submit the electronic equivalent of this claim form, which contains a substantially similar certification.

45. CMS guidance as to electronic claims submission is found in Chapter 24 of the Medicare Claims Processing Manual, CMS Publication No. 100-04 (the "Claims Manual"). Among other things, the guidance specifies the minimum content of the enrollment form that a Medicare Administrative Contractor ("MAC") may use to sign up providers such as Defendants to submit claims electronically. Per the Claims Manual, such an enrollment form must contain, and the enrolling provider must acknowledge, at least the following statements:

> The provider agrees to the following provisions for submitting Medicare claims electronically to CMS or to CMS' A/B MACs or CEDI:
>
> * * *
>
> 7. That it will submit claims that are accurate, complete, and truthful;
>
> * * *

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

12. That it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsified or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law; [and]

* * *

14. That it will research and correct claim discrepancies[.]

Claims Processing Manual, Chapter 24 § 30.2.[1]

46. Compliance with applicable Medicare program rules and regulations is material to the government's decision to pay and its subsequent payment of claims. In order to be reimbursable by Medicare, services must be medically necessary, must actually be provided, and must be documented in a manner that allows CMS to determine if the services are properly payable.

47. At all times relevant herein, Defendants have been enrolled Medicare providers. Defendants are eligible to receive reimbursement from CMS for care they provide to patients who are insured through Medicare.

### VI.     DEFENDANTS' FRAUD

48. All previous paragraphs are included herein as if restated verbatim.

49. UPG requires all physicians, physician's assistants and nurse practitioners to enter and execute an "Employment Agreement" [PEA] before beginning employment.

50. Pursuant to Section 2 of the PEA:

> *Referral Requirement.* During [professional's] employment with Practice, [professional] shall refer all patients requiring medical services to the Clinic(s) or other Practice facilities, other physicians employed by Practice, or other facilities and suppliers owned or operated by a Practice Affiliate; provided however, the foregoing requirement does not apply in

---

[1] *Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c24.pdf (last accessed October 25, 2018).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

any of the following events: (a) if the patient expresses a preference for a different provider, practitioner or supplier; (b) if the patient's insurer or other payor makes the determination as to the provider, practitioner or supplier who will provide such services; ( c) if, as determined by [professional] in the in the exercise of his or her independent medical judgment, the referral is not in the patient's best medical interest; or ( d) the referral relates to services that are not provided by [professional] under the scope of this employment arrangement. For purposes of this subsection, Practice Affiliate means an entity owned by Practice's parent company or its parent company.

51. According to Fletcher's own testimony, LHG owns UPG, and LHG is a wholly owned subsidiary of LifeBrite. Thus, all referrals were required to be made to LifeBrite Laboratories under the agreement.

52. Despite the exceptions listed in the Agreement, all physicians, physician's assistants, and nurse practitioners working for UPG were told to only refer UDTs to LifeBrite.

53. During office visits with physicians, physician's assistants, and nurse practitioners, UPG patients were asked to provide a urine sample for testing. That urine was not tested in house, but was sent to LifeBrite for testing.

54. After the urine was sent to LifeBrite, the physicians, physician's assistants, or nurse practitioners were not contacted again until all testing was done. In the vast majority of cases, if not all cases, the drug testing results were returned to the physicians, physician's assistants, or nurse practitioners with both presumptive and determinative testing. The treating physicians, physician's assistants, and nurse practitioners who initially ordered the UDT, and who were solely responsible for the care and treatment of the patients, played no role in determining if a determinative UDT test was medically necessary.

55. Fletcher, LHG, and LifeBrite caused providers to routinely order excessive UDT for their patients—without an individualized assessment of which tests were actually necessary for a given patient—by utilizing a default UDT panel established by LifeBrite. In fact, in late

2019, LifeBrite issued new default UDT testing guidelines that required more UDT tests than were allowed by the current CMA guidelines.

56. Under CMA guidelines, specifically LCD-L35724, (1) patients at low risk were allowed to be tested between 1 and 2 times every year; (2) patients at medium risk were allowed to be tested between 1 and 2 times every 6 months; and (3) patients at high risk were allowed to be tested between 1 and 2 times per quarter. Most importantly, "testing must be based on a clinician's documented medical necessity and reviewed by the clinician in the management of prescribing/renewing a controlled substance for every risk group."

57. The LCD-L35724 was last updated on 8/29/2019.

58. In November 2019, UPG issued a new Toxicology Testing Policy to its physicians and employees. Under the new policy, (1) patients at low risk were required to be randomly tested 2 times every year; (2) patients at medium risk were required to be randomly tested 2 times every 6 months; and (3) patients at high risk were required to be tested 2 times per quarter.

59. UPG physicians, physician's assistants, and nurse practitioners were not given options regarding which panel to use or what specific tests to include in the panel. There was no indication given to the physicians, physician's assistants, and nurse practitioners as to the results of a patient's presumptive test nor that they were not used in determining whether to run definitive UDT. Rather, LifeBrite performed definitive UDTs on a routine basis. These practices resulted in UDTs that were medically unreasonable and unnecessary, which Defendants billed to Medicare, Medicaid, and TRICARE.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

60. The determination as to which tests LifeBrite performed on a particular patient's urine specimen was not based on the patient's clinical history, risk of abuse, or individual clinical assessment, but rather driven exclusively by the Toxicology Policy of UPG.

61. In addition to the UDT fraud, Defendants engaged in submitting false bills to Medicare, Medicaid, and Tricare for services performed by a physician's assistant, but charged as if performed by a licensed physician.

## COUNT I
## FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

62. As described above, Defendants submitted or caused false claims to be submitted to CMS or its contractors because (a) Defendants billed Medicare for higher levels of service than they actually provided; and (b) Defendants billed Medicare for prescriptions which were not medically necessary.

63. The submission of these false claims caused the CMS to pay out monies that it would not have paid if it had known of the falsity of these claims.

64. CMS contractors, such as MACs, are recipients of money from the United States within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). The United States has provided portions of the money Defendants requested from the contractors, or will reimburse the contractors for such money. All such money is to be spent to advance the United States' interest in the Medicare program.

65. Accordingly, Defendants knowingly presented false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(l)(A).

66. Each false or fraudulent claim submitted to CMS or its contractors is a separate violation of the FCA.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

67. By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in an amount to be proven at trial.

## COUNT II
## FEDERAL FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID

68. As described above, Defendants used false records and statements when they submitted or caused claims for payment to be submitted to the CMS or its contractors, including false documentation of patient visits.

69. The submission of these false records or statements caused the CMS to pay out monies that it would not have paid if it had known of the falsity of Defendants' records or statements.

70. CMS contractors, such as MACs, are recipients of money from the United States within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). The United States has provided portions of the money Defendants requested from the contractors, or will reimburse the contractors for such money. All such money is to be spent to advance the United States' interest in the Medicare program.

71. Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(l)(B).

72. Each submission of a false record or statement to CMS or its contractors is a separate violation of the FCA.

73. By reason of the false or fraudulent records or statements that Defendants knowingly submitted, the United States has been damaged in an amount to be proven at trial.

## STARK ACT VIOLATIONS

74. All previous paragraphs are included herein as if restated verbatim.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

75. Defendant entered into Employment Agreements with its physicians, physician's assistants and nurse practitioners ("Employed Professionals") on staff at UPG which do not meet the fair market value and commercial reasonableness requirements of the employment exception to the referral prohibition for designated health services under the provisions of the Ethics in Patient Referrals Act of 1989, 42 U.S.C. § 1395nn ("Stark Law").

76. Defendants knew that the Employment Agreements did not meet the fair market value and commercial reasonableness requirements of the Stark Law.

77. The Employment Agreements made referrals to the parent company of UPG, also owned and operated by Defendant Fletcher, a requisite condition of continued employment with UPG.

78. Referrals by the Employed Professionals to LifeBrite for designated health services, as defined in 42 U.S.C. § 1395nn(h)(6), were prohibited referrals under 42 U.S.C. § 1395nn(a)(1)(A).

79. Defendants knowingly and willfully violated the provisions of 42 U.S.C. § 1395nn(a)(l)(B) by presenting bills for designated health services furnished pursuant to referrals from the Employed Professionals which were prohibited by the Stark Law.

80. Defendants knowingly and willfully submitted false claims to the government by certifying that all claims submitted were in compliance with all applicable statutes and regulations when Defendants had been advised and was aware that submission of these claims was prohibited under the Stark Law.

81. The United States Government, unaware of the falsity of the claims and in reliance on the accuracy thereof, paid the claims for the prohibited referrals.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**PRAYER FOR RELIEF**

**WHEREFORE**, Relators respectfully request that this Court enter judgment in their favor and that of the United States, and against Defendants, granting the following on all Counts:

(A)  an award to the United States for treble its damages, a civil penalty for each violation of the FCA, and its costs pursuant to 31 U.S.C. § 3729(a)(3);

(B)  an award to Relators in the maximum amount permitted under 31 U.S.C. § 3730(d), and for the reasonable attorney's fees and costs they incurred in prosecuting this action;

(C)  awards to the United States and Relators for pre- and post-judgment interest at the rates permitted by law; and

(D)  an award of such other and further relief as this Court may deem to be just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relators demand trial by jury on all questions of fact raised by the Complaint.

s/Tucker S. Player, Esq. (S.C. Bar# 16217/Fed ID#7512)
**Player Law Firm, LLC**
1415 Broad River Rd
Columbia, SC 29210
803-772-8008
Tucker@PlayerLawFirm.com

-    AND    -

Candy M. Kern, Esq. (SC Bar# 011392/Fed ID#9149)
**Upstate Law Group, LLC**
P.O. Box 238
Anderson, SC 29622
864-226-8938
Candy@UpstateLawGroup.com

July 1, 2020                **ATTORNEYS FOR PLAINTIFFS**